In the Matter of UNITED WHOLESAL-
ERS, INC., a Wisconsin corporation,
bankrupt.

NORTHWAY WHOLESALE, INC., a Wis-
consin corporation, Petitioner,

Cletus J. Johnson, Receiver thereof,
Appellant,

v.

WISCONSIN VALLEY TRUST COMPA-
NY, Trustee in Bankruptcy for United
Wholesalers, Inc., a Wisconsin corpora-
tion, Defendant-Appellee.

No. 12746.

United States Court of Appeals
Seventh Circuit.

Feb. 1, 1960.

Robert L. Bittner, Bittner & Reynolds, Green Bay, Wis., for appellant.

Richard P. Tinkham, Arthur L. Eberlein, Wausau, Wis., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Cletus J. Johnson, receiver for Northway Wholesale, Inc., a Wisconsin corporation, bankrupt, petitioner,[1] has appealed from a judgment of the district court in favor of Wisconsin Valley Trust Company, a Wisconsin corporation, trustee in bankruptcy for United Wholesalers, Inc., a Wisconsin corporation,[2] defendant.

The court's judgment, *inter alia,* awarded to the trustee in bankruptcy of United, a judgment against Northway in the net amount of $63,243.69, with interest from April 22, 1958.

The instant proceedings were initiated by a reclamation petition in which Northway asserted title to certain goods stored in a bonded warehouse operated by St. Paul Terminal Warehouse Company in Wausau, Wisconsin.

The matter was referred to a referee in bankruptcy, who conducted hearings and reported the evidence heard and his findings and conclusions to the court, which heard further evidence and made its own findings of fact. Both the court and the referee ruled in favor of United's trustee in bankruptcy and against Northway, resulting in the judgment now appealed.

There is no inconsistency between the findings of the referee and those of the court. Those made by the court include the following, *inter alia*:

"4. That on or about July 1, 1957, bankrupt corporation, its officers and agents, worked out a method of financing with the Crest Finance Co., Inc., of Chicago, Illinois, which operated as follows: St. Paul Terminal Warehouse Company of St. Paul, Minnesota, was hired by bankrupt corporation to operate what was called a 'field warehouse' in roughly the north half of the warehouse building in question which housed the bankrupt corporation's entire operations. One of the bankrupt's employees, Milton Landrum, was placed in charge of the warehouse and his salary continued to be paid in fact by the bankrupt as it had been prior to the time of the establishment of the so-called 'field warehouse,' but after the establishment of the 'field warehouse' his salary was paid through the St. Paul Terminal Warehouse Company. Since the adjudication in bankruptcy the said Milton Landrum has con-

---

1. Herein also referred to as Northway.

2. Herein also referred to as United.

tinued to work in the same warehouse but now as the employee and on behalf of Northway Wholesale, Inc. and Lawrence Warehouse Company, a field warehousing concern, which is handling the operations for the Northway Wholesale, Inc. at the same warehouse location.

"13. That the actual custody, control, and possession of the merchandise placed in the so-called 'field warehouse' operated in form only by St. Paul Terminal Warehouse Company remained in the bankrupt corporation at all times on and after July 1, 1957; that at no time did St. Paul Terminal Warehouse Company acquire custody, possession or control of or over the merchandise placed in the so-called 'field warehouse' and no real or true field warehouse ever came into existence as between the bankrupt corporation, St. Paul Terminal Warehouse Company and Crest Finance Co., Inc.; that the so-called 'warehouse receipts' issued to Crest Finance Co., Inc. on and after July 1, 1957, were not issued in compliance with Chapter 119 of the Wisconsin Statutes and no valid warehouse receipt or receipts came into existence at any time on or after July 1, 1957, so as to give Crest Finance Co., Inc. valid title or right to the merchandise purportedly covered by such claimed warehouse receipts.

"15. That the bankrupt corporation was hopelessly insolvent as of July 1, 1957, and continued to be hopelessly insolvent thereafter up to and including the date it was adjudicated a bankrupt and ceased doing business in April of 1958, when it was then insolvent at least to the extent of $250,000.00; that during all of 1957 and during the year 1958, prior to the time of its adjudication in bankruptcy, the bankrupt corporation was unable to meet its obligations as they matured or to pay its creditors for the merchandise being received upon open account and immediately placed in the so-called 'field warehouse' and immediately covered by so-called warehouse receipts.

"16. That all of the warehouse receipts issued by bankrupt corporation and/or St. Paul Terminal Warehouse Company to Crest Finance Co., Inc. were issued within one year prior to the filing of the petition in bankruptcy for the bankrupt corporation, and said warehouse receipts constituted an attempt to transfer virtually all of the assets of the bankrupt corporation, acquired for the most part on open account, beyond the reach of the bankrupt corporation's creditors, and such warehouse receipts were made and given with the actual intent to hinder, delay, or defraud either existing or future creditors contrary to paragraph 67(2) (d) [sic] of the Bankruptcy Act, [11 U.S.C.A. § 107, sub. d (2)] and were and are therefore wholly void.

"17. That on April 16, 1958, merchandise costing and having a value in excess of $102,243.69 was located in the portion of the warehouse of bankrupt corporation allegedly operated as a 'field warehouse' * * *; that on April 16, 1958, Crest Finance Co., Inc. sold all of the warehouse receipts held by it, allegedly covering said merchandise * * * to Northway Wholesale, Inc. for $39,000.00; * * *.

"19. That on June 30, 1958, Northway Wholesale, Inc. prepared and caused to be published and distributed to numerous persons, including credit agencies, merchandise suppliers, and other individuals with whom Northway Wholesale, Inc. was doing business, a financial statement purporting to show its financial condition as of June 30, 1958, intending that the same be relied upon by numerous and diverse individuals referred to above; that the said financial statement listed as a current asset the merchandise received through the warehouse receipts obtained from Crest Finance Company at a total value of $109,310.00, with an entry on the credit or surplus side of the statement under the caption 'Gain on Inventory Purchase' $70,310.00; that the said figure of $70,310.00 was the difference between the purchase price of the said merchandise, i. e. $39,000.00 and the actual value thereof as shown upon Northway Wholesale Inc.'s own financial

statement of $109,310.00; that said financial statement of June 30, 1958, was received in evidence as Exhibit 'A' upon the hearing before the Court on January 16, 1959, at Wausau, Wisconsin."

■■ 1. We have examined the evidence in the record, having in mind our limited authority to disturb the findings of the district court under rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. rule 52(a), which applies in bankruptcy cases, In Matter of Tyne, 7 Cir., 234 F.2d 907; Morris Plan Industrial Bank v. Henderson, 2 Cir., 131 F.2d 975, 976, and Stewart v. Ganey, 5 Cir., 116 F.2d 1010. We cannot say that these findings of fact are erroneous; therefore, we do not set them aside.

2. Under the facts thus established in the court below, it becomes a question of law as to whether its judgment is correct.

■ While evidently an attempt was made to have the warehouse operation in this case conform to the formal requirements of the Wisconsin Uniform Warehouse Receipts Act, Wisconsin Statutes, 1957, ch. 119, p. 2059 et seq., the court looks to the substance rather than the form of the transaction here involved for the purpose of determining its true nature. As the court said in McGaffey Canning Co., Inc. v. Bank of America, 109 Cal.App. 415, 294 P. 45, 53:

> "Whether warehousing is called 'field warehousing' or by any other name, it cannot be effectively conducted in this state without compliance with the law as declared in section 3440 of the Civil Code. Merely colorable or constructive change of possession accomplishes nothing in favor of a pledgee. There must be open, visible, unequivocal change of possession, manifested by such substantial outward signs as to make it evident to the world that the control of the owner has wholly ceased, and that another has acquired, and is openly exercising, the exclusive dominion over the property. * * *

> "Actual change of possession means existing in act, and truly and absolutely carried out, as opposed to formal, potential, virtual, or theoretical change. * * *

> "The appointment of the owner, or one of his staff, as a warehouseman's custodian of goods stored, while not conclusively ineffectual, is nevertheless a circumstance to give pause, and must be carefully weighed in connection with the other facts in evidence. * * *"

To the same effect, see Security Warehousing Co. v. Hand, 206 U.S. 415, at page 426, 27 S.Ct. 720, at page 724, 51 L.Ed. 1117, affirming this court, 143 F. 32, where the Supreme Court said:

> "* * * Such a scheme, under the facts and as carried out in this case, and with regard to Wisconsin law, was a fraud in fact, and neither the receipts nor the so-called pledge could be asserted against any of the creditors."

The facts in that case were essentially the same as in the case at bar.

■ The nature of the operation here convinces us that all of the warehouse receipts involved, which were issued within one year prior to the filing of the petition in bankruptcy, were intended to hinder, delay or defraud creditors, in violation of § 67, sub. d(2) of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. d(2), and hence were void.

■ 3. The district court's finding 19, supported by substantial evidence in the record, establishes that, in its financial statement of June 30, 1958, Northway admitted that it had acquired for $39,000 United's merchandise which had a manufacturers' cost price to United of $102,000. Such a statement is admissible, Davis v. Fay, 265 Wis. 426, 429, 61 N.W.2d 885, and it is immaterial to whom the statement was made. 31 C.J.S. Evidence § 270, p. 1022. The evidence shows that this statement was sent

to various persons and agencies, as found by the court in finding 19, supra.

For the reasons herein set forth, the judgment of the district court is affirmed.

Affirmed.